Emma Bruden, OSB # 163525
KAMPMEIER & KNUTSEN PLLC
1300 SE Stark Street, Suite 202
Portland, Oregon 97214
Telephone: (503) 719-5641
Email: emma@kampmeierknutsen.com

Jonah Sandford, OSB # 154711
NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S. Terwilliger Blvd.
Portland, Oregon 97219
Telephone: (503) 768-6726
Email: jonah@nedc.org

*Attorneys for Plaintiff Northwest Environmental Defense Center*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, an Oregon non-profit corporation, | Case No. 3:21-cv-00844 |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| v. | |
| **WESTROCK CP, LLC**, a Delaware corporation, | **(Pursuant to Clean Water Act, 33 U.S.C. § 1365(a)(1))** |
| Defendant. | |

## I.    INTRODUCTION.

1.    This action is a citizen suit alleging violations of the Clean Water Act ("CWA" or "Act"), as amended, 33 U.S.C. §§ 1251 *et seq*. Defendant WestRock CP, LLC ("WestRock" or

"Defendant") owns and operates an industrial facility—The WestRock Portland facility, which produces corrugated boxes, sheets, and trays—on the east bank of the Willamette River in Portland, Oregon. WestRock has a National Pollutant Discharge Elimination System ("NPDES") permit that authorizes discharges of pollutants and stormwater associated with industrial activity from Defendant's facility to waters of the United States, provided WestRock and the discharges comply with the terms and conditions of the permit. Plaintiff Northwest Environmental Defense Center ("NEDC") alleges Defendant is regularly violating the terms and conditions of its NPDES permit. NEDC seeks declaratory and injunctive relief, the imposition of civil penalties, an award of costs, attorneys' fees, and expert witness fees, and other relief for Defendant's repeated and ongoing violations of its NPDES permit and the Clean Water Act.

## II.    JURISDICTION AND VENUE.

2.    This Court has jurisdiction pursuant to 33 U.S.C. § 1365 (CWA citizen suit provision) and 28 U.S.C. § 1331 (federal question). WestRock is in violation of an "effluent standard or limitation" as defined by Section 505 of the Act, 33 U.S.C. § 1365. The relief requested herein is proper under 28 U.S.C. §§ 2201 and 2202, and 33 U.S.C. §§ 1319(d) and 1365.

3.    NEDC has satisfied the jurisdictional requirements for bringing this suit. In accordance with Section 505(b)(1)(A) of the Act, 33 U.S.C. § 1365(b)(1)(A), by certified letter dated and postmarked March 16, 2021, NEDC notified WestRock and its registered agent of Defendant's alleged violations of its NPDES permit and the CWA and of NEDC's intent to sue for those violations ("Notice Letter"). NEDC also notified the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Administrator of EPA Region 10, and the Director of the Oregon Department of Environmental Quality ("ODEQ") of NEDC's intent to sue Defendant by mailing a copy of the Notice Letter to those officials on March 16, 2021. A copy of the Notice

Letter is attached to this Complaint as <u>Exhibit 1</u> and the allegations therein are hereby incorporated by reference.

4.      More than sixty days have passed since NEDC mailed the Notice Letter and the violations complained of are continuing or reasonably likely to continue to occur. Neither EPA nor ODEQ has commenced any action constituting diligent prosecution to redress the violations alleged in the Notice Letter. Defendant is in ongoing violation of the Clean Water Act.

5.      Venue is appropriate in this District under Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations complained of is located in this District, in Multnomah County, Oregon.

6.      A copy of this Complaint will be served on the Attorney General of the United States, the Administrator of the EPA, and the Administrator of EPA Region 10, as required by 33 U.S.C. § 1365(c)(3) and 40 C.F.R. § 135.4.

### III.    PARTIES.

7.      Plaintiff Northwest Environmental Defense Center is a membership organization suing on behalf of itself and its members. NEDC is an independent non-profit corporation organized and existing under the laws of the State of Oregon. NEDC maintains its principal place of business in Multnomah County, Oregon. Since 1969, the staff, student volunteers, and members of NEDC have advocated for cleaner water and air and for the preservation of public lands and wildlife habitat across the Pacific Northwest.

8.      The mission of NEDC is to protect and conserve the environment and natural resources of the Pacific Northwest. NEDC and its members work to conserve and protect water resources and aquatic species of the Pacific Northwest. NEDC and its members have a particular interest in, and derive aesthetic, recreational, and other benefits from, Oregon's rivers, streams,

lakes, and bays, including the Willamette River and the Columbia River, as well as the aquatic

species that use and rely on those waters. NEDC's members use and enjoy the Willamette River

and the Columbia River, including waters and adjacent lands downstream from Defendant's dis-

charges of pollutants, for recreational and other activities, including boating, fishing, nature

watching, hiking, biking, aesthetic enjoyment, and other activities. Additionally, many members

of NEDC live or work near the Willamette River or the Columbia River or otherwise have an in-

terest in the Willamette and Columbia rivers and the aquatic species that inhabit or use those wa-

ters. NEDC and its members intend to continue all of these activities in the future.

      9.      NEDC has standing to bring this lawsuit. NEDC and its members are "citizens" as

defined by Section 505(g) of the Act, 33 U.S.C. § 1365(g). NEDC has at least one member who

is injured by Defendant's discharges of pollutants and polluted stormwater and its failure to com-

ply with its NPDES permit and the CWA. Recreational, economic, aesthetic, conservation,

health, and other interests of NEDC and its members have been, are being, and will be adversely

affected by Defendant's violations of the CWA and unauthorized discharges of pollutants and/or

industrial stormwater to the Willamette River. NEDC's and its members' interests in the

Willamette River and waters downstream of it are diminished by their polluted state, by Defend-

ant's illegal discharges of pollutants and industrial stormwater, and by Defendant's other viola-

tions of the CWA. These injuries are fairly traceable to the conduct challenged herein. The relief

sought in this lawsuit can redress the injuries to NEDC and NEDC's members' interests.

      10.      Defendant WestRock is a corporation organized and existing under the laws of the

State of Delaware and is authorized to conduct business in Oregon. Defendant owns and operates

an industrial facility at or near 9930 North Burgard Way, Portland, Oregon 97203 (hereinafter

"the Facility"). Defendant's Facility is on land adjacent to the Willamette River. Defendant's Facility discharges pollutants and stormwater associated with industrial activity via point sources to the Willamette River.

## IV.    LEGAL BACKGROUND.

11.    Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

12.    As relevant here, Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits "the discharge of any pollutant by any person" unless such discharge is authorized by an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

13.    The Act defines the term "discharge of a pollutant" to mean, in part, "any addition of any pollutant to navigable waters from any point source . . . ." 33 U.S.C. § 1362(12).

14.    The Act defines the term "point source" to mean, in part, "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. * * *." 33 U.S.C. § 1362(14).

15.    The Act defines the term "pollutant" to mean, in part, "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. * * *." 33 U.S.C. § 1362(6).

16.    Although neither the Act nor its implementing regulations define the term "addition," courts have found that "addition" means the introduction of a pollutant into navigable waters from any place outside the particular water body. *See, e.g.*, *Catskill Mountains Chapter of*

*Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 491 (2d Cir. 2001).

17.     The Act's prohibition on discharging pollutants from point sources applies broadly. The Act defines the term "navigable waters" to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). And the Act defines the term "person" to mean "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." *Id.* § 1362(5).

18.     The Act regulates and requires an NPDES permit for stormwater discharges "associated with industrial activity." 33 U.S.C. § 1342(p)(2)(B), (p)(3)(A). EPA regulations define the term "stormwater discharge associated with industrial activity" in part to mean "the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14).

19.     Federal and state regulations require any person who discharges or proposes to discharge pollutants or stormwater associated with industrial activity to waters of the United States to apply for an NPDES permit. 40 C.F.R. § 122.21(a); Or. Admin. R. 340-045-0015(2) & 5. Section 402(a) of the Act empowers EPA or an authorized state to issue NPDES permits authorizing discharges of pollutants or stormwater associated with industrial activity. 33 U.S.C. § 1342(a). EPA may delegate administration of the NPDES permit program to states with regulatory programs meeting applicable criteria. *Id.* § 1342(b); 40 C.F.R. Part 123.

20.     Compliance with the terms and conditions of an NPDES permit is deemed compliance with the general discharge prohibition in Section 301(a) of the Act. 33 U.S.C. § 1342(k). Any permit noncompliance is grounds for a citizen enforcement action. *Id.* § 1365(a)(1), (f)(7).

## V.   FACTS.

**A.   Oregon's General NPDES Stormwater Discharge Permit Number 1200-Z and De-fendant's NPDES Permit Coverage.**

21.     The State of Oregon implements a federally approved NPDES Permit program administered by ODEQ. *See* Oregon Administrative Rules ("OAR") Ch. 340-045. ODEQ issues general and individual NPDES permits authorizing discharges of pollutants in the State of Oregon. A person seeking coverage under one of ODEQ's general permits must submit certain application materials to ODEQ, which then assigns NPDES permit coverage to the discharger if appropriate.

22.     ODEQ periodically issues a General NPDES Stormwater Discharge Permit Number 1200-Z ("1200-Z Permit") authorizing discharges of stormwater associated with industrial activity in Oregon. For facilities that obtain coverage under it, the 1200-Z Permit authorizes discharges of stormwater associated with industrial activity to waters of the United States, provided the permittee and discharges are in compliance with the terms and conditions of the permit.

23.     To reduce and eliminate pollutant concentrations in stormwater discharges, the 1200-Z Permit requires permittees to, among things, develop and implement a Stormwater Pollution Control Plan ("SWPCP"); to monitor and report pollutant loadings in stormwater discharged from the facility; and, in certain circumstances, to revise the SWPCP and implement more comprehensive stormwater management practices over time to protect water quality.

24.     ODEQ issued one iteration of the 1200-Z Permit on October 1, 2011, with an effective date of July 1, 2012 (hereinafter "2012 Permit"). For facilities granted coverage under it, the 2012 Permit conditionally authorized stormwater discharges associated with industrial activity from July 1, 2012 to June 30, 2017. The specific terms and conditions of the 2012 Permit at issue in this case are described below and in the Notice Letter. *See* Ex. 1.

COMPLAINT – 7

25.    ODEQ issued the most recent iteration of the 1200-Z Permit on August 1, 2017 (hereinafter "2017 Permit"). This permit was subsequently reissued upon reconsideration by letter dated October 23, 2018. For facilities granted coverage under it, the 2017 Permit conditionally authorized stormwater discharges associated with industrial activity, as well as some non-stormwater discharges of pollutants, from August 1, 2017 to July 31, 2022. The specific terms and conditions of the 2017 Permit at issue in this case are described in detail below and in the Notice Letter. *See* Ex. 1.

26.    Defendant's Facility discharges pollutants and stormwater associated with industrial activity via discernible, confined, and discrete conveyances to the Willamette River.

27.    ODEQ authorized Defendant, under its previous corporate name RockTenn CP, LLC, to discharge stormwater associated with industrial activity from its Facility from July 1, 2012 to June 30, 2017 by issuing RockTenn CP, LLC coverage under the 2012 Permit. ODEQ assigned Defendant file and permit number 109845. In July 2015, Defendant's corporate name was changed to WestRock CP, LLC. ODEQ then authorized WestRock to discharge stormwater associated with industrial activity, as well as some non-stormwater discharges of pollutants, from its Facility from August 1, 2017 to July 31, 2022 by issuing WestRock coverage under the 2017 Permit under the same file number.

28.    WestRock's 2012 Permit and 2017 Permit (together "the Permits") require WestRock to monitor stormwater discharges from the Facility. The stormwater monitoring data described in Tables 1 and 2 that are attached to the Notice Letter as Appendix A accurately reflect stormwater monitoring results that WestRock submitted to ODEQ.

29.    WestRock's Permits prohibit any direct or indirect discharge to waters of the state that is not in compliance with the terms and conditions of the Permits. WestRock's Permits also

clearly state: "Any permit noncompliance constitutes a violation of . . . the Clean Water Act . . . and is grounds for enforcement action."

**B.    WestRock Has Violated and Is Violating Its 2012 and 2017 Permits.**

30.    WestRock is discharging pollutants and stormwater associated with industrial activity from its Facility to the Willamette River in violation of the terms and conditions in the 2017 Permit. WestRock also violated similar terms and conditions in the 2012 Permit. Westrock's violations of the Permits are set forth in Section II of the Notice Letter and are hereby incorporated into this Complaint by reference. WestRock's violations of the Permits constitute violations of an "effluent standard or limitation" under the CWA. 33 U.S.C. § 1365(a), (f)(7).

**1.    WestRock Violated Its Permits by Failing to Comply with the Permits' Narrative, Technology-Based Effluent Limitations and the Control Measures Required to Meet Those Effluent Limitations.**

31.    Schedules A.1 of the Permits require WestRock to implement the listed narrative, technology-based effluent limits—a variety of best management practices listed in the Permits—to reduce pollutants in stormwater discharged from the Facility. Additionally, Schedule A.3.a of the 2017 Permit requires WestRock "to select, design, install, implement and maintain control measures . . . to meet the narrative and numeric technology based effluent limits in Schedule A.1, A.2 and Schedule E of this permit and [to] describe these measures in the SWPCP." Schedule A.3.b of the 2017 Permit requires WestRock to "reduce or eliminate pollutants to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." Schedule A.3.d of the 2017 Permit requires WestRock to "install, implement, and maintain the control measures in accordance with good engineering practices and manufacturers specifications." Schedules A.1, A.3.a, A.3.b, and A.3.c in

the 2012 Permit imposed the same or substantially similar obligations on WestRock.

32.     WestRock violated and continues to violate Schedules A.1, A.3.a, A.3.b of the Permits, and Schedule A.3.d of the 2017 Permit (2012 Permit Schedule A.3.c) by failing to meet the narrative technology-based effluent limits in Schedule A.1 of the Permits; by failing to select, design, install, implement, and maintain control measures to ensure compliance with the technology-based effluent limits in Schedule A.1 of the Permits; by failing to reduce or eliminate pollutants to the extent achievable using control measures that are technologically available, economically practicable, and achievable in light of best industry practice; and by failing to install, implement, and maintain the control measures in accordance with good engineering practices and manufacturers specifications.

33.     Several specific instances of WestRock's violations of Schedules A.1, A.3.a, A.3.b, and A.3.d of the 2017 Permit have been documented by Portland Bureau of Environmental Services ("BES") staff during Facility inspections. WestRock violated Schedules A.1, A.3.a, A.3.b, and A.3.d of the 2017 Permit on May 2, 2018 because of significant sediment and debris accumulation near catch basins 8 and 13b at the Facility, because of sediment accumulation at many catch basin filters, because of damaged biobags surrounding several catch basins, and because of sediment accumulation within a manhole upstream of outfall 2. WestRock violated Schedules A.1, A.3.a, A.3.b, and A.3.d of the 2017 Permit on December 3, 2018 because a catch basin was not draining, because the biobags around catch basin 7 were damaged, and because a waste storage bin was open. WestRock violated Schedules A.1, A.3.a, A.3.b, and A.3.d of the 2017 Permit on January 29, 2020 because of debris accumulation near catch basin 13A; because of drag out from the building to the outside area near catch basin 6; because catch basin filter inserts in several of the Facility's catch basins were not installed correctly, causing stormwater to

discharge untreated; because the boom surrounding catch basin 4 was damaged, resulting in a clogged catch basin filter; and because some of the roof downspouts were damaged. These and other documented violations are described in Section II.A.1 of the Notice Letter and are incorporated herein by this reference.

34.     WestRock's violations of Schedules A.1, A.3.a, and A.3.b of the Permits are also demonstrated by the fact that Defendant's stormwater discharges regularly exceed the Permits' numeric benchmarks for several pollutants. Schedules A.9 of the Permits explain that pollutant benchmarks in the Permits "are designed to assist the permit registrant in determining whether its site controls are effectively reducing pollutant concentrations in stormwater discharged from the site." Schedules A.9 and B.1.a of the 2017 Permit then require WestRock to monitor stormwater discharges from the Facility to determine whether the discharges exceed any of the following *statewide benchmarks*: total copper, 0.020 mg/L; total lead, 0.040 mg/L; total zinc, 0.12 mg/L; pH, 5.5 – 9.0 S.U.; total suspended solids, 30 mg/L; and total oil and grease, 10 mg/L. Schedules A.9 and B.1.a of the 2012 Permit imposed the same or substantially similar obligations except that the benchmark for total suspended solids in the 2012 Permit was 100 mg/L. Additionally, Schedule B.1.b of the 2017 Permit and ODEQ's permit assignment letters to WestRock require WestRock to monitor stormwater discharges from the Facility to determine whether the discharges exceed various *impairment pollutant benchmarks*, including Dissolved Copper, 0.012 mg/L; and Total Iron, 1.0 mg/L. Schedule B.1.b of the 2012 Permit and ODEQ's permit assignment letters imposed the same or substantially similar obligations except that they did not require WestRock to monitor for dissolved copper.

35.     As indicated in Tables 1 and 2 that are attached to the Notice Letter as Appendix

A, stormwater discharges from the Facility have repeatedly exceeded the statewide and impairment pollutant benchmarks in the Permits and the Facility's permit assignment letters. The history and pattern of stormwater sample results exceeding a statewide benchmark or reference concentration for an impairment pollutant for the Facility demonstrate that WestRock has regularly failed to comply with the narrative technology-based effluent limits in Schedules A.1 of the Permits, and failed to select, design, install, implement, and maintain control measures necessary to meet those limits, in violation of Schedules A.3.a and A.3.b in the Permits. Additionally, this history and pattern of pollutant benchmark exceedances demonstrate that WestRock's Facility's site controls are not effectively eliminating or minimizing pollutants in stormwater discharged from the Facility, and are not reducing or eliminating pollutants to the extent achievable, in violation of Schedules A.1, A.3.a, and A.3.b in the Permits. These permit requirements and Defendant's violations thereof are described in Section II.A.2 of the Notice Letter and are incorporated herein by reference. These violations have occurred each and every day since April 4, 2016, and are ongoing or reasonably likely to recur.

    **2.**    **WestRock Violated Its Permits by Failing to Develop and Implement a SWPCP that Complies with all the Requirements of the Permits.**

36.    Schedules A.3.a of the Permits require WestRock to describe its pollutant control measures, maintenance schedules, and the frequency of housekeeping measures in its SWPCP. Schedule A.6.c of the 2017 Permit requires WestRock to include in its SWPCP each narrative technology-based effluent limit to eliminate or reduce the potential to contaminate stormwater and prevent any violation of instream water quality standards. Schedules A.7 of the Permits set forth the requirements for SWPCPs, including in Schedule A.7.b.vi of the 2017 Permit and in Schedule A.7.b.v of the 2012 Permit the requirement that SWPCPs include a description of con-

trol measures installed and implemented to meet the technology and water quality based requirements in Schedules A.1–A.5 and any applicable sector-specific requirements in Schedule E. Schedule A.6.c of the 2012 Permit and Schedule A.6.d of the 2017 Permit then require WestRock to implement the SWPCP and any revisions to it.

37.     WestRock violated these Permit conditions on May 2, 2018, by failing to perform routine cleaning of catch basins, catch basin filters, and manholes, and by failing to replace damaged biobags; on December 3, 2018, by failing to cover all waste contained in dumpsters, by failing to perform routine catch basins, and by failing to replace damaged biobags; and on January 29, 2020, by failing to perform routine cleaning of catch basins and other areas that may contribute pollutants to stormwater, and by failing to maintain catch basin inserts, booms, and downspouts to ensure effective operation as designed.

38.     WestRock also violated and continues to violate these Permit conditions by failing to maintain and implement an adequate SWPCP at the Facility. The extensive benchmark exceedances documented in Tables 1 and 2 that are attached to the Notice Letter as Appendix A, the extensive water quality violations and corrective action violations described herein, and ongoing discharges of polluted industrial stormwater from the Facility demonstrate that WestRock is not maintaining or implementing a SWPCP that includes adequate control measures and all of the required SWPCP components. These violations have occurred each and every day since April 4, 2016 and are ongoing or reasonably likely to recur.

**3.     WestRock Violated Its Permits by Failing to Comply with the Permits' Corrective Action Requirements.**

39.     Schedules A.10.a of the Permits require WestRock to undertake a Tier I corrective action response each time a stormwater monitoring result exceeds any statewide benchmark, sector-specific benchmark, or reference concentration for an impairment pollutant. Specifically,

those Permit conditions require WestRock, within 30 calendar days of obtaining monitoring re-

sults demonstrating a benchmark or reference concentration exceedance, to: (1) investigate the

cause of the elevated pollutant levels and develop a plan for controlling significant materials

from previous operations; (2) review the SWPCP and the selection, design, installation and im-

plementation of control measures to ensure compliance with the permit, including evaluating

whether treatment measures have been properly installed, maintained, and implemented, and

evaluate whether additional removal or modifications to pollutant source isolation are necessary;

(3) revise the SWPCP if necessary and submit the revised SWPCP and a schedule for imple-

menting additional control measures to ODEQ or BES; and (4) write a Tier I report and, if ex-

ceedance of an impairment pollutant benchmark triggered the Tier I corrective response, submit

the Tier I report to ODEQ or BES within sixty days of receiving the monitoring results that trig-

gered the corrective action response.

      40.    Schedule A.10.b of the 2012 Permit required WestRock to implement Tier I cor-

rective actions before the next storm event or as soon as practicable. Schedule A.10.b of the 2017

Permit requires WestRock to implement Tier I corrective actions no later than thirty days after

receiving monitoring results showing an exceedance of any applicable statewide benchmark in

Schedule A.9 of the Permits or any reference concentration for impairment pollutants identified

in WestRock's permit assignment letters. If WestRock cannot complete corrective actions within

those time periods it must explain the reasoning for the delay in a Tier 1 report.

      41.    WestRock violated Schedules A.10.a of the Permits by failing to prepare Tier 1

corrective action reports within 30 calendar days of obtaining the stormwater monitoring results

from the following sampling dates: November 15, 2016; December 30, 2016; January 20, 2017;

and November 20, 2017.

42.     Additionally, WestRock violated Schedule A.10.a.v of the 2017 Permit by failing to submit Tier 1 corrective action reports to ODEQ or BES within 60 calendar days after receiving monitoring results demonstrating an exceedance of an impairment pollutant reference concentration for iron and/or dissolved copper. WestRock violated this 2017 Permit condition after receiving monitoring results for stormwater sampling that occurred on January 22, 2019 (iron); February 11, 2019 (iron); March 25, 2019 (iron and dissolved copper); and April 5, 2019 (iron).

43.     WestRock violated Schedule A.10.a.iv of the 2017 Permit by preparing and/or submitting inadequate Tier I corrective action reports. This Permit condition requires WestRock to summarize specific information in a "Tier 1 Report," including: (1) the results of its investigation into the cause of elevated pollutant levels; (2) corrective actions taken or to be taken, or, if determined that no corrective action is necessary, the basis for this determination; and (3) documentation of whether SWPCP revisions are necessary. WestRock violated these permit conditions by failing to timely submit Tier I Reports that meet all the above criteria. These violations occurred during the periods and in the manners stated in the third, fourth, fifth, and sixth paragraphs of Section II.C.1 of the Notice Letter and are hereby incorporated by reference. These violations are ongoing or reasonably likely to recur.

44.     WestRock violated Schedules A.10.b of the Permits by failing to implement corrective actions in a timely manner, including implementation of modified control measures, even though such corrective actions are necessary to meet the effluent limitations and other conditions in the Permits. As documented in Tables 1 and 2 that are attached to the Notice Letter as Appendix A, WestRock regularly discharges in excess of the statewide benchmarks in Schedules A.9 of the Permits and the reference concentrations for impairment pollutants identified in WestRock's

permit assignment letters. Each exceedance triggered WestRock's obligation to implement corrective actions by the deadlines stated in Schedules A.10.b of the Permits. The repeated exceedances of multiple pollutant benchmarks and reference concentrations demonstrate that WestRock is not implementing corrective actions in a timely manner as required by the Permits. These requirements and Defendant's violations thereof are described in Section II.C.2 of the Notice Letter and are hereby incorporated by reference. These violations have occurred each and every day since April 4, 2016, and are ongoing.

> **4.    WestRock Violated Its Permits by Failing to Comply with the Permits' Monitoring Requirements.**

45.    Schedules B.2 of the Permits require WestRock to take stormwater samples from each discharge point at its Facility unless that discharge point serves an area without exposure of stormwater to industrial activities or that discharge point "has effluent that is substantially similar to the effluent(s) of a monitored discharge point and the same BMPs are implemented and maintained at the substantially similar discharge points or drainage areas that lead to the discharge points."

46.    WestRock violated Schedule B.2.c of the 2017 Permit by failing to take stormwater samples at all discharge points with different effluent streams. These violations occurred during the periods and in the manners stated in Section II.D of the Notice Letter and are hereby incorporated by reference. These violations are ongoing or reasonably likely to recur.

> **5.    WestRock Violated Its Permits by Failing to Comply with the Permits' Water Quality Based Effluent Limitations and Related Reporting Requirements.**

47.    Schedules A.4.a of the Permits prohibit WestRock from causing or contributing to a violation of instream water quality standards established in Oregon Administrative Rules

("OAR") 340-041. And Schedules F.A6 of the Permits require WestRock to comply with any applicable effluent standards or prohibitions established under OAR 340-041-0033 for toxic pollutants.

48.    OAR 340-041-007(1) states that "the highest and best practicable treatment and/or control of wastes, activities, and flows must in every case be provided so as to maintain...toxic materials...at the lowest possible levels." OAR 340-041-0033(1) prohibits the introduction of toxic substances above natural background levels in concentrations and/or combinations that may be harmful to public health, safety, aquatic life, and wildlife. And OAR 340-041-0033(2) states that levels of toxic substances in waters of the state may not exceed the applicable aquatic life criteria as defined in Table 30 under OAR 340-041-0083. ODEQ established these and other water quality standards to protect human health and other important beneficial uses such as recreation, drinking water sources, and habitat for salmon and steelhead. Or. Rev. Stat. §§ 468B0.15, 468B0.48.

49.    The Permits established reference concentrations for impairment pollutants based on these water quality standards. WestRock discharges into a water body (the Willamette River) identified as failing to meet water quality standards for iron and copper. Table 30 and Table 40 in OAR 340-041-0083 identify the concentrations of these toxic pollutants that may be harmful. Table 30 identifies toxic pollutant criteria for the protection of aquatic life. And Table 40 identifies concentrations of toxic pollutants "derived to protect Oregonians from potential adverse health impacts associated with long-term exposure to toxic substances associated with consumption of fish, shellfish, and water." In its permit assignment letters to WestRock, ODEQ incorporated these aquatic life and human health criteria into the Permits as reference concentrations for impairment pollutants.

COMPLAINT – 17

50.    WestRock violated and continues to violate Schedules A.4.a and F.A6 of the Permits by discharging pollutants and industrial stormwater from the facility in amounts or manners that cause or contribute to violations of these and other water quality standards. As indicated in Tables 1 and 2 that are attached to the Notice Letter as Appendix A, discharges from WestRock's Facility regularly contain elevated levels of the toxic impairment pollutants iron and dissolved copper. Discharges of those pollutants from the Facility violate OAR 340-041-0033(1) because they contribute toxic substances above natural background levels in concentrations that may be harmful to public health, safety, aquatic life, and wildlife. The discharges of iron and copper also violate OAR 340-041-0033(2) by exceeding the applicable aquatic life criteria for these pollutants. And the discharges of iron and copper violate OAR 340-041-007(1) because WestRock failed to use the highest and best practicable treatment to maintain these toxic materials at the lowest possible levels.

51.    WestRock violated Schedules A.4.a and F.A6 of the Permits each and every day since April 4, 2016 that WestRock discharged iron or dissolved copper from the Facility in concentrations above the applicable reference concentration for these toxic pollutants. As noted in Tables 1 and 2 that are attached to the Notice Letter as Appendix A, some of those discharges and violations occurred on November 15, 2016; January 20, 2017; March 7, 2017; November 20, 2017; May 10, 2018; November 21, 2018; December 18, 2018; January 22, 2019; February 11, 2019; March 25, 2019; April 5, 2019; November 26, 2019; December 12, 2019; March 6, 2020; May 14, 2020; November 5, 2020; and December 16, 2020. Other violations occurred each and every day since April 4, 2016 on which there was 0.1 inch or more of precipitation at the Facility because, on information and belief, on those days the Facility discharged pollutants, industrial

stormwater or wastewater to the Willamette River that included iron and dissolved copper in excess of one or more of the impairment pollutant benchmarks established in the Permits and permit assignment letters for the Facility. Defendant's violations of Schedules A.4.a and F.A6 of the Permits are described in the fifth paragraph of Section II.E of the Notice Letter and are incorporated herein by reference. These violations are ongoing or reasonably likely to recur.

52.     Additionally, Schedules A.4.b of the Permits require WestRock to take certain actions upon becoming aware that a discharge from the Facility caused or contributed to an exceedance of water quality standards, including: investigating the conditions that triggered the violation; reviewing the SWPCP to ensure compliance with the permit; submitting a Water Quality Standards Corrective Action report within thirty days of receiving the relevant monitoring data, which report must meet certain criteria stated in the Permits; and implementing any required corrective actions before the next storm event or within thirty days after discovering the violation, whichever comes first. WestRock violated these requirements by failing to investigate the conditions triggering water quality exceedances for iron and dissolved copper; failing to review the SWPCP to ensure compliance with the Permits; failing to submit each and every required Water Quality Standards Corrective Action report within thirty days of receiving the relevant monitoring data; and failing to implement required corrective actions before the next storm event or within thirty days after discovering the violation, whichever comes first. Defendant's violations of Schedules A.4.b of the Permits are described in the final paragraph of Section II.E of the Notice Letter and are incorporated herein by reference. These violations occurred each and every day since April 4, 2016, and are ongoing or reasonably likely to recur.

**6.      WestRock Violated Its Permits by Failing to Comply with the Permits' Inspection Requirements.**

53.     Schedules B.7.a of the Permits require WestRock to perform monthly inspections

of "areas where industrial materials or activities are exposed to stormwater and areas where stormwater control measures, structures, catch basins, and treatment facilities are located." These inspections must include "visual observation for the presence of floating, suspended or settleable solids, color, odor, foam, visible oil sheen, or other obvious indicators of pollution in the storm-water discharge at all discharge point(s) . . . ." When these observations show evidence of such stormwater pollution, WestRock must complete a Tier I corrective action report. These visual observations "must be conducted during a discharge event if one occurs during the month, re-gardless whether the monthly site inspection has already occurred." Inspections must include all discharge points. And Schedule B.7.b of the 2012 Permit and Schedule B.7.f of the 2017 Permit require WestRock to document all inspections in an inspection report that includes certain spe-cific information and that is retained on site and submitted to ODEQ or BES upon request.

54.     WestRock violated the inspection requirements in Schedules B.7 of the Permits on multiple occasions. For example, WestRock failed to complete visual observations during stormwater discharges in November 16, May 2017, June 2017, September 2017, November 2017, December 2017, January 2018, and April 2018. Each of the inspection requirements and Defendant's violations thereof are described in Section II.F of the Notice Letter and are hereby incorporated by reference. These violations are ongoing or reasonably likely to recur.

**7.     WestRock Violated Its Permits by Failing to Comply with the Permits' Re-quirements to Prepare and Submit Noncompliance Reports.**

55.     Schedules F.D6 of the Permits require WestRock to report all instances of non-compliance with its permit not reported under General Condition D4 or D5 at the time WestRock submits monitoring reports. Each noncompliance report must include: (1) a description of the noncompliance and its cause; (2) the period of noncompliance, including exact dates and times; (3) the estimated time the noncompliance is expected to continue if it has not been corrected; and

(4) the steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompli-ance. WestRock violated Schedules F.D6 of the Permits by failing to prepare and submit non-compliance reports that fully and accurately identify WestRock's noncompliance with the Per-mits and that include all the required information. These requirements and Defendant's viola-tions thereof are described in Section II.G of the Notice Letter and are hereby incorporated by reference. These violations have occurred each and every day since April 4, 2016, and are ongo-ing or reasonably likely to recur.

**8. WestRock Violated its Permits by Failing to Comply with the Permits' Gen-eral Requirements.**

56. Schedules F.A1 of the Permits require WestRock to comply with all conditions of its Permits. Each and every permit violation described herein is also a violation of Schedules F.A1 of the Permits. WestRock violated these Permit conditions each and every day since April 4, 2016. These violations are ongoing or reasonably likely to recur.

57. Schedules F.A3 of the Permits require WestRock to take all reasonable steps to minimize or prevent any discharge in violation of the Permits. Each and every permit violation described herein is also a violation of Schedules F.A3 of the Permits. WestRock violated these Permit conditions each and every day since April 4, 2016, by violating the Permits and by failing to take reasonable steps to minimize or prevent discharges in violation of the Permits. These vio-lations are ongoing or reasonably likely to recur.

58. Schedules F.B1 of the Permits require WestRock to "at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) that are installed or used by the permittee to achieve compliance with the conditions" of the Permits. WestRock violated these Permit conditions each and every day since April 4, 2016 by failing to properly operate and maintain all systems of treatment and control, including WestRock's

SWPCP, to achieve compliance with the Permits. These violations are ongoing or reasonably likely to recur.

59.    These requirements and Defendant's violations thereof are described in Section II.H of the Notice Letter and are hereby incorporated by reference.

60.    Defendant's unlawful discharges degrade the environment and the water quality of the Willamette River and the Columbia River.

61.    Defendant's unlawful discharges of pollutants and permit violations were avoidable had Defendant been diligent in overseeing and controlling operations, maintenance, monitoring, and compliance with the law.

62.    Defendant has benefitted economically from its unlawful discharges of pollutants and permit violations.

63.    The NPDES permit violations committed by Defendant are continuing or are reasonably likely to recur. Any and all additional violations of Defendant's NPDES Permits and the CWA which occur after those described in NEDC's Notice Letter but before a final decision in this action are continuing violations subject to this Complaint.

64.    Without the imposition of appropriate civil penalties and the issuance of an injunction, Defendant is likely to continue to violate its NPDES permit and the CWA to the further injury of NEDC, its members, and others.

## VI.    CAUSE OF ACTION.

65.    Plaintiff hereby alleges and incorporates by reference all of the preceding paragraphs.

66.    Defendant WestRock is a "person" within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a), and is subject to suit under the Act's citizen suit provision,

33 U.S.C. § 1365.

67.     The violations of Defendant's NPDES Permits described herein and in the Notice

Letter constitute violations of an "effluent standard or limitation" as defined by section 505 of

the CWA, 33 U.S.C. § 1365. Defendant WestRock has violated and is violating an "effluent

standard or limitation" as that term is defined by Section 505 of the Act, 33 U.S.C. § 1365, by

violating the terms and conditions of its NPDES Permits.

## VII.    RELIEF REQUESTED.

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.     Declare that Defendant has violated and continues to be in violation of its NPDES

Permits and the Clean Water Act, as alleged herein;

B.     Enjoin Defendant from operating its Facility in a manner that results in further vi-

olations of its NPDES permits or the CWA;

C.     Order Defendant to immediately implement a SWPCP that complies with its 2017

Permit or any subsequent NPDES permit applicable to the Facility;

D.     Order Defendant to remediate the environmental damage and ongoing impacts re-

sulting from its violations;

E.     Order Defendant to develop and/or comply with appropriate quality assurance

procedures to ensure future compliance with the Clean Water Act;

F.     Order Defendant to provide NEDC, for a period of time beginning on the date of

this Court's Order granting NEDC relief and running for one year after Defendant achieves com-

pliance with all of the conditions of its NPDES permit, with copies of all reports and other docu-

ments that Defendant submits to the EPA, ODEQ, or BES regarding Defendant's NPDES Permit

for the Facility at the time those documents are submitted to these agencies;

G.      Order Defendant to take specific actions to remediate the environmental harm

caused by its violations;

H.      Grant such other preliminary and/or permanent relief as NEDC may from time to

time request during the pendency of this case;

I.      Order Defendant to pay civil penalties pursuant to Sections 309(d) and 505(a) of

the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and 40 C.F.R. § 19;

J.      Award NEDC its litigation expenses, including reasonable attorneys' and expert

witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

K.      Award such other relief as this Court deems appropriate.

RESPECTFULLY SUBMITTED this 3rd day of June 2021.

KAMPMEIER & KNUTSEN PLLC

By: s/ Emma Bruden
      Emma A. O. Bruden, OSB # 163525
1300 SE Stark Street, Suite 202
Portland, Oregon 97214
Telephone: (503) 719-5641
Email: emma@kampmeierknutsen.com


NORTHWEST ENVIRONMENTAL DEFENSE CENTER

By: s/ Jonah Sandford
      Jonah Sandford, OSB # 154711
10101 S. Terwilliger Blvd.
Portland, Oregon 97219
Telephone: (503) 768-6726
Email: jonah@nedc.org

*Attorneys for Plaintiff Northwest Environmental Defense Center*